## JAMES MILTON HARDING *v.* STATE OF MARYLAND

[No. 367, September Term, 1967.]

*Decided October 9, 1968.*

The cause was argued before MURPHY, C.J., and ANDERSON, MORTON, ORTH, and THOMPSON, JJ.

*Ellis H. Goodman* and *Jerome A. Loughran, Jr.,* for appellant.

*David T. Mason, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Richard J. Kinlein, State's Attorney for Howard County, Neil Helfrich, Assistant State's Attorney for Howard County,* and *Robert S. Fertitta, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

THOMPSON, J., delivered the opinion of the Court.

James Milton Harding, the appellant, appeals from convictions for assault with intent to rape and assault with intent to murder in a jury trial in the Criminal Court of Baltimore, Judge James A. Perrott presiding. He was sentenced to a term of 20 years on the assault with intent to rape charge and to a consecutive term of 15 years on the assault with intent to murder charge.

There was evidence from which the jury could find: On Sunday, September 18, 1966, at approximately 5:00 P.M., Harding met Mildred Coley, the prosecuting witness, in a bar in Baltimore City. Subsequently, they joined Barbara Miles and Robert Lee Sanders, and all four of them drank and rode around the city in Sanders' car until approximately 8:30 P.M. when they left to go to Howard County. Mildred Coley was not previously acquainted with any of the other three persons. En route to and in Howard County, they made several stops. Mildred sat in the front seat of the car with Barbara and Sanders, while Harding sat in the back seat alone. Harding became angry and argued with Mildred because of her refusal to sit in the back seat with him and her refusal to have sexual relations with him. Eventually, Harding told Mildred he had a gun and he was going to have sexual relations with her before she left the car. Mildred told Harding that "If you put your damn hands on me, I'm going to cut you." After making this statement, Mildred opened her purse to get a face sponge, and when she turned in the direction of Harding, he shot her. She had no weapons. After the shooting Sanders wanted to call the rescue squad or take Mildred to the hospital; however, Harding, with gun in hand, ordered him to drive to Mayfield Avenue, a back road in an isolated area of Howard County. Harding removed Mildred, who was unconscious and presumed dead, and placed her on the side of the road. After returning to the car, Harding directed Sanders to drive to Club Vegas near Fort Meade, and then to Club 1630. At this club, Harding met his brother, Charles B. Harding. Barbara, who lived in Baltimore, left the club with some friends, while Sanders and Harding left together. Sanders drove Harding home and was followed by Harding's brother in his station wagon. When Sanders left he observed Harding get into his brother's station wagon.

On Monday, September 19, 1966, at approximately 7:15 A.
M. State Trooper William J. Foxwell, in response to a com-
plaint, found Mildred lying four or five feet off the traveled
portion of Meadow Ridge Road in Howard County, which
was two or three miles from the spot where she had been placed
after being shot. She was in a state of shock, wearing only a
black dress, with her undergarments beside her. She was taken
to St. Agnes Hospital where an emergency operation was per-
formed on her chest. Further examination disclosed spermato-
zoa in her vagina.

Initially, Mildred was questioned by Trooper William George
who testified as follows:

"Q. You said that the first time you interviewed the
victim she indicated she had been raped by whom?

"A. She told me three colored males. She had been
abducted from Baltimore City at knife point, taken in-
to the County, raped and stabbed.

"Q. Now, the second time you visited her in the
hospital you inquired of her again, and what did she
tell you?

"A. Essentially—Well, by this time we knew she
hadn't been stabbed. In fact, she had been shot. Dur-
ing both of these periods she appeared to be in shock
or going into shock. Both of these times were before
she was operated on and only an Emergency Room
type investigation of her wounds had been made. On
the second occasion, after receiving the description of
the car and knowing this person Robert Lee Sanders,
a picture of him was taken and shown to her.

"Q. Then what did you do?

"A. After she positively identified this picture, then
Robert Lee Sanders was later in the afternoon ar-
rested and taken to the Barracks for investigation."

* * *

"Q. You said then you visited the victim a third
time and the third time the situation changed again.
What happened there?

"A. At this particular time, which happened to be
on 9/21 at two p.m., she was visited in the Intensive

Care Unit of St. Agnes Hospital and talked to thoroughly, and it appeared evident that this girl could not remember certain parts of what had happened to her. She would take us all the way up to the point where she had been shot. She would go on to the point where she was put out of the car and then she told me she couldn't remember anything. Her mind had cleared to the point where she knew who had shot her. She knew who was with her and she knew the complete description of the automobile."

On October 12, 1966, upon being released from the hospital, Mildred was taken to the Waterloo Police Barracks where she was put under hypnosis by Ralph P. Oropolo, Chief Clinical Psychologist at Clifton T. Perkins State Hospital. While under hypnosis, and without prompting, Mildred was able to recall events that had occurred after she was shot. On the witness stand she testified as follows:

"Q. Do you recall anything that was said to you while you were under hypnosis?

"A. Anything was said to me? Yes, when I was yes. . .

"Q. When you were hypnotized, you recall what was said to you?

"A. What had really, what had blanked out in my mind all came back to me."

\* \* \*

"Q. Then when you awakened from this sleep they told you what you had said while you were asleep?

"A. No, I told them what happened after I woke up. I was awake."

\* \* \*

"Q. Did anybody talk to you when you awakened from this trance?

"A. Yes.

"Q. Who?

"A. Trooper George.

"Q. What did he say to you?

"A. He asked me how was I feeling. He say 'How

does it feel to be hypnotized?', and I told him it was a nice sleep.

"Q. What else did he say?

"A. He asked me questions what happened between Harding and I and I could answer them then, things I couldn't answer before. It all came back to me.

"Q. Were you told what happened and then it came back to you?

"A. No, I wasn't told what happened and it came back to me. When I was asleep it all came back to me and I told them what happened when I was awake."

In addition, she identified Harding as the person who shot her, and she also testified that while she was lying on the side of the road, she saw a vehicle approaching which looked like a bread truck or station wagon. The vehicle stopped and Harding picked her up and threw her into the back of the vehicle and drove off. On arrival at another location, he threw her on the ground between an old house and a tree. He then unzippered her dress as she passed out. When she regained consciousness, she noticed that all of her clothes had been removed except her dress, that she tried to stand but was too weak, so she dragged her clothes with her and scrambled to the highway. Mildred also testified that when she regained consciousness, she "realized that he had sex with me."

Harding did not testify. His brother admitted that he had a station wagon and was at Club 1630 where he saw Harding on the night in question but denied that Harding used his car.

Harding contends that the testimony of Ralph P. Oropolo, the psychologist, and the testimony of Mildred Coley with respect to the assault with intent to rape were not admissible; and the evidence was insufficient to support the conviction for this crime.

The objection concerning the testimony of Oropolo was as to his qualifications. The record discloses that he has a Master's Degree in Psychology and has pursued work on his doctorate. He is Chief Clinical Psychologist at Clifton T. Perkins State Hospital and a lecturer at the Institute of Correctional Administration, American University, Washington, D. C. He was for-

merly staff psychologist at Crownsville State Hospital and has been employed as a consulting psychologist by several law enforcement agencies and state's attorneys' offices in Maryland and other states. In addition, he has qualified to testify in court as an expert in the field of psychology in Baltimore City and several counties in Maryland. In his training and education as a psychologist, he was familiarized with hypnosis or hypnotherapy as a form of treatment. The record further disclosed that hypnosis is used as an analytical tool and technique by psychologists and the medical profession, as a form of therapy, and as a means of assisting patients to recover lost memory. During the past four years, Oropolo has used the technique of hypnosis, and he has also used hypnosis under circumstances similar to those in the case at bar. Harding's objections to the qualifications are based primarily on the fact that Mr. Oropolo did not graduate from any school of hypnotism. The Court of Appeals in the case of *Hewitt v. Maryland State Board of Censors,* 243 Md. 574, 221 A. 2d 894 held that the admission of expert testimony is primarily a matter for the trial judge to decide. But the opinion makes clear that formal training is unnecessary so long as the record demonstrates that he is possessed "of any knowledge or information which would elevate his opinion above the level of conjecture or personal reaction," *Hewitt, supra* at 221 A. 2d 902. The formal training in hypnosis which was provided in Mr. Oropolo's education as a psychologist and his use of hypnosis for four years indicates to us that the trial judge quite properly admitted his testimony.

The admissibility of Mildred Coley's testimony concerning the assault with intent to rape case causes no difficulty. On the witness stand she recited the facts and stated that she was doing so from her own recollection. The fact that she had told different stories or had achieved her present knowledge after being hypnotized concerns the question of the weight of the evidence which the trier of facts, in this case the jury, must decide. *Borman v. State,* 1 Md. App. 276, 229 A. 2d 440, *Carroll v. State,* 3 Md. App. 50, 237 A. 2d 535, *Thompson v. State,* 4 Md. App. 31, 240 A. 2d 780.

The sufficiency of her evidence to support the verdict re-

quires more elaborate discussion. We will begin by quoting extensively from the testimony of the psychologist.

"Q. Mr. Oropolo, I wonder if I could ask you to step down to this blackboard and illustrate to the Jury exactly what you accomplish by hypnosis.

"A. Hypnosis is really—takes no great feat. Essentially anyone can do it, despite what appears to be a very mysterious kind of process. All that is involved in inducing a person into hypnosis is a very boring voice and monotonous repetition of words. Any of us can do it. The other thing that is necessary is a certain amount of willingness on the part of the individual, because hypnosis is essentially a very conscious type activity because you are asking the individual to focus on something or asking an individual to listen to something, and if he doesn't want to, he can look some place else and intentionally distract himself. So, a great amount of willingness is necessary on the part of the individual being hypnotized, so you don't have somebody under your power, so to speak. This is not quite accurate and you do require a certain amount of conscious participation by the individual. What happens in hypnosis, or what is involved, you are reducing a certain amount of consciousness. For instance, all of you see everything going on in here, but there are different degrees of things you are consciously aware of. Because I am speaking and standing here, you are more conscious of me than other people in the courtroom. There are levels of consciousness with respect to certain things in particular areas. In hypnosis what we try to do is try to reduce the number of things that distract a person and try to get the person to focus on a certain thing. In this way more details can be impressed upon the person. For instance, if I were to direct your attention to the blackboard and you are reducing your consciousness of me even more so and I would ask you to give the details of this blackboard, you could do it fairly well. If I didn't direct your attention to the blackboard, the amount of details would

be somewhat reduced. In a sense you might say you are sort of hypnotized there. Because of focusing you are reducing your external or outward stimulations. We get an individual to focus all his stimulus on an object, neutral, that has no consequence as a means of reducing or removing consciousness or awareness of other things. What I usually do, the instrument I use is just a thumbtack pinned into a wall, that is shiny, or I may use a spiral type thing, something like this. This is what the novice uses, but the essential element is that the person is able to focus on a relatively neutral object for the purpose of reducing all outward influences. The reason for this is in recovering memory what happens is—let's kind of try to divide the mind something like this: this being the conscious part. What I mean by conscious, this is the part that makes us aware of who we are, of the courtroom of people. These are all various stimulations that come in from without and you are consciously aware of it. There may be other material that will come through, but go down here. Might say this is sort of unconscious, wherein we can't really deprive the stimulation from coming through. We can refuse to acknowledge it and its presence here because it is rather painful to us, rather traumatic to us, what have you, but we cannot prevent it from coming in but prevent it from acknowledgment. You might be in a social setting with maybe three or four people on a walk. There is somebody you dislike a great deal. You can't refuse to let him be present but you can refuse to talk to him. You are refusing his physical presence. The same thing happens essentially with respect to certain stimuli or certain things that occur to us. We cannot prevent them from occurring but we can refuse to acknowledge. That goes through this area of consciousness and gets burried down here in the unconscious. You might regard it as a basement; everything gets thrown down there you don't want. By hypnosis, by compelling a person to focus on one stimulus what you essen-

tially do is his area of consciousness becomes limited. So, the only thing the person is conscious of is this one stimulus, the thumbtack in the wall, or the spiral or the clinician's phrase telling him you are getting tired, getting sleepy, all this other stuff is kind of eliminated. With the elimination of all this extraneous material you can help the patient to focus their stimulus on occurrences or events that went right through and as a result of reducing the conscious influence which kind of acts as a distraction, this barrier a little bit, so now you don't have all this conscious stuff acting as a conscious influence and reinforces the barrier between the conscious and the unconscious. You leave the mind fairly clear to focus on this one subject and as a result quite frequently you can have the subject come back into conscious awareness. Whether you can do this or not depends how far down the material is, how long ago it happened, so forth, by the determination the material the conscious did not want to acknowledge, although it occurred, to come back into acknowledgment, into awareness. This is essentially what happens on hypnosis, theoretically."

\* \* \*

"Q. Mr. Oropollo, [sic] when you bring this information from the subconscious to the conscious level of the mind through hypnosis, is the revelation of that information reliable?

"A. It depends what the information is. If it is something that again involved a personal or vital interest to the individual, it may not be. What I mean by personal and vital; let me give an example. Let's say you have an individual who is, has very, very strong homosexual tendencies or let's say he is a homosexual and consciously denied it. If you put him under hypnosis and try to elicit this kind of admission from him, there is a good possibility, or to have him act it out, there is a good possibility he may say he is not or he doesn't do it or what have you. Again, depends on what is of vital interest to the individual or

what emotional or psychological danger it would submit him to.

"Q. Is a person under the hypnotic influence of the clinical subject to suggestion by him of answers or stories to questions that he might ask him?

"A. In my own experience I seriously doubt suggestibility in the way we think of, in that you have an influence and the person subjects himself to your influence. The person, is suggestible to the extent that the condition or the subject that it allows him to discuss this thing or act out this thing or behave this way, but in a way it is no more suggestible than I ask you to hand me that paper you will willingly do it. To that extent you are suggestible. I ask you to do something and you do it. There is no threat and you give it. Under hypnosis to this extent there is suggestibility and I have tried in working with some individuals and also criminal cases where I would purposely try to assure reliability of the individual by maybe suggesting something and asking them if this is correct and they would still stick to their initial statement.

"Q. I direct your attention to October 12, 1966, and I ask you on that date did you have occasion to contact one Mildred Hortense Coley?

"A. Yes.

"Q. And under what circumstances did you meet Miss Coley and where was it?

"A. The State Police called me and asked me if I would come over there, or they told me they had an individual who had been the victim of some criminal act and that she was having a difficult time or could not recall events that occurred or circumstances under which these events occurred, and asked me if I would come over there and give any assistance I could.

"Q. And upon your arrival what did you do?

"A. Upon my arrival I was familiarized with more details of the situation and I met the young lady and explained to her what I was going to do to help her

get her memory back, whatever memory she may have lost as a result of trauma of the incident.

"Q. You say you were filled in on the background by the police and you informed her what you intended to do and the purpose of it. Then what mechanics did you utilize in order to effect what you were about to do?

"A. I used a thumbtack, the sort that has a shiny head. There is a blank wall and I just pinned the thumbtack in and asked her to concentrate, focus her eyes on the thumbtack and listen to my voice and the voice might make her simply just relax, relax, relax, you are getting very tired; very monotonous and repetitive manner.

"Q. In this manner were you able to put her into some sort of trance state?

"A. She was under hypnosis."

\* \* \*

"Q. What happened as a result of what you did?

"A. Well, she went into a reduced state of consciousness.

"Q. And what did you do?

"A. Then I recalled the date in question and simply asked her to tell me everything that happened.

"Q. Was she able to tell you?

"A. Yes. She was able to relate everything that occurred."

\* \* \*

"Q. You put her into this state of reduced consciousness and she told you her story. Then what did you do?

"A. When she got into the state of reduced consciousness, then I—then two of the State Troopers came in. I asked two State Troopers to come in.

"Q. Do you know who they were?

"A. I believe Sergeant Greffen and I believe Trooper George.

"Q. What participation did they take in what you were doing?

"A. I just wanted them simply as witnesses since they were interested in it, and I was disinterested. I believe they recorded everything that she said.

"Q. They recorded it, you say?

"A. I believe so. Tape recorder; I'm not sure.

"Q. Then what did you do?

"A. Well, after I was finished I gave her the suggestion that when she would awaken she would relate that which she related under the state of reduced consciousness.

"Q. You say you gave her a suggestion. What do you mean by that?

"A. I simply told her that when she would awaken she would recount the same thing that she recounted under the state of reduced consciousness.

"Q. Was she able to do that?

"A. Yes.

"Q. And was her ability to recall the result of your suggestion that she would?

"A. I don't understand the question.

"Q. You say you suggested that she could recall what she had told you while under hypnosis?

"A. Right.

"Q. And that after this suggestion she was awakened?

"A. Uh-huh.

"Q. And then she recalled what she had said while under hypnosis?

"A. Yes, in its entirety.

"Q. When she recalled this the second time after you awakened her, was she still under hypnosis?

"A. No.

"Q. Was this recollection a result of the suggestion you made to her?

"A. Yes, in that it was in a situation that provided her to want to do so.

"Q. You said your questioning took the form— you reminded her, brought her attention to the time

you were discussing. What form did the questioning take thereafter?

"A. Here is how I started out. I told her I'm going to ask you to tell me everything that happened, or I recall something, I don't recall, tell me everything that happened on June 26th, whatever it was, and she went on and recounted, and as her—I would occasionally say, and tell me what else, what else happened, and this is essentially the form of the questioning.

"Q. At any time during your hypnosis of her did you suggest any answers to any questions?

"A. No, I never do.

"Q. Did you relate any stories that you thought would be likely?

"A. No.

"Q. Did the policemen participate in any way by suggesting any answers to her?

"A. No. I never permit this. Usually when I put the person under hypnosis I usually give instructions the person will not hear any other voice or sound except mine, so no other external source can go through to her, since she can't hear.

"Q. Is the information that results from such a session as you describe reliable or unreliable?

"A. In this situation I would say that it was reliable.

"Q. Why would you say that?

"A. Because there was certain information that was provided by the police to me later and there were also self-corroborative statements she made. Also, her recall afterwards was essentially the same.

"Q. If she had been falsifying under hypnosis, would her later recall have been the same?

"A. Might not have been. Also, if she wanted to falsify she could have falsified before I induced hypnosis."

* * *

"Q. You stated in one of your previous answers

you felt in this instance the information you received from the subject was reliable. Why would this instance be more reliable than any other one you might have referred to?

"A. For the one reason this was something that she would have no reason to withhold, say, in a completely conscious state, since there was no threat to her vital interests to withhold this information. If she wanted to lie, she certainly could have given a statement without any difficulty, which she was unable to do. Secondly, there was some corroborative material within her statement that would indicate some of the things occurred, not occurred, but some of the things she had seen, she could have only seen if she had been there.

"Q. Unable to do? Could it have been the fact she was unwilling to do it?

"A. No. If she would have been unwilling to do it, it would probably have been impossible to even hypnotize her."

Trooper George's testimony confirmed that given by Mr. Oropolo as to what occurred when he was present and in addition showed that Mildred Coley was hypnotized for approximately 45 minutes. No witness testified as to what she said during or after the hypnosis.

The trial judge gave a precautionary instruction to the jury as follows:

"You have heard, during this trial, that a portion of the testimony of the prosecuting witness, Mrs. Coley, was recalled by her as a result of her being placed under hypnosis. The phenomenon commonly known as hypnosis has been explained to you during this trial. I advise you to weigh this testimony carefully. Do not place any greater weight on this portion of Mrs. Coley's testimony than on any other testimony that you have heard during this trial. Remember, you are the judges of the weight and the believability of all of the evidence in this case."

Although several courts [1] of the United States have considered the question of hypnosis only one seems to be particularly apropos to our question here.

In *Austin v. Barker,* 85 N. Y. S. 465 (Sup. Ct. App. Div. 4th Dept.), a civil action for seduction of the plaintiff's daughter, the court reversed and remanded the case for a new trial. The sole evidence of the defendant's involvement was given by the daughter. She stated that she did not remember having had intercourse with anyone until some weeks after she delivered

---

1. (1) *People v. Ebanks,* 49 Pac. 1049 (Cal. 1897) refusing testimony of hypnotists as to statements made while the accused was under hypnosis; (2) *Parks v. State,* 64 N. E. 862 (Ind. 1902) affirmed the conviction of a hypnotist as practicing medicine without a license; (3) *State v. Donovan,* 102 N. W. 791 (Iowa 1905) holding a combination of flattery, love-making, and hypnotism was sufficient predicate for a prosecution for seduction; (4) *State v. Exum,* 50 S. E. 283 (N. C. 1905) holding that testimony of witness that her husband (the defendant) had hypnotized her three times was admissible as affecting her credibility; (5) *Louis v. State,* 130 So. 904 (Ala. 1930) reversed a conviction for robbery committed by hypnosis, holding that there was no threats or force used in securing the money from the victim; (6) *State v. Pusch,* 46 N. W. 2d 508 (N. D. 1950) affirming rejection of statements made while in a hypnotic state by the accused; (7) *People v. Leyra,* 98 N. E. 2d 533 (N. Y. 1951) on remand, aff'd 108 N. E. 2d 673 *cert. denied* 345 U. S. 918, 73 S. Ct. 730, 97 L. Ed. 1351, habeas corpus denied *Leyra v. Denno,* 113 F. Supp. 556, aff'd 208 F. 2d 605 *cert. granted* 347 U. S. 556, 74 S. Ct. 716, 99 L. Ed. 671 (1954) holding a confession induced by hypnosis inadmissible. It should be noted, however, that on the facts the confession would not have been admitted despite the lack of hypnosis; (8) *Cornell v. Superior Court,* 338 P. 2d 447 (Cal. 1959) allowed mandamus to compel the trial court to permit the petitioner to examine his client with the aid of a hypnotist; (9) *People v. Busch,* 366 P. 2d 314 (Cal. 1961) sustaining trial court's refusal to permit a general medical practitioner from expressing an opinion on the state of mind of the accused on occasion of the homicide insofar as his opinion was based on hypnosis. The record showed that the doctor's knowledge of and experience in hypnosis was limited; (10) *Sheppard v. Koblentz,* 187 N. E. 2d 40 (Ohio 1962) mandamus refused to require Warden to permit a convicted prisoner to undergo hypnosis or polygraph test for the purpose of establishing his innocence. For early authorities see 40 L. R. A. 269 (1897). For a comprehensive case note see 31 Neb. Law Review 575 (1952).

a normal healthy child. At this time, the plaintiff's attorney visited her and so influenced and awakened her mind that she recalled that the defendant on several occasions had placed her under hypnosis and had intercourse with her. These events occurred in a room in her father's house while one or both of her parents were seated in an adjoining room. The New York court required that on the remand the plaintiff be required to produce evidence of what actually happened to restore the daughter's memory and evidence tending to establish the probability or possibility of the existence of the fact that her memory of intercourse could have been blurred by hypnosis and could have been restored by hypnosis. After the case was retried the same court in *Austin v. Barker,* 96 N. Y. S. 814 (1906) again reversed the conviction because of the failure of the plaintiff to produce evidence as to what actually happened at the time the witness' memory was restored and because two medical doctors indicated skepticism that she could have been made to forget her acts of intercourse particularly since she stated that the first of them was the first intercourse she had experienced.

In the present appeal as in *Austin v. Barker, supra,* the witness testified that at the time she was on the stand she remembered the incident she was describing, but in addition to that we have the testimony of the operator who gave a detailed description of what happened at the time hypnosis was induced which showed that there were no improper suggestions made. Further he gave his opinion as a trained and experienced psychologist that in this particular incident there was no reason to doubt the accuracy of the witness' recollections. In addition modern medical science has now recognized the possibility that memory of painful events can sometimes be restored by hypnosis, although some authorities warn that fancy can be mingled with fact in some cases. Noyes & Klob, *Modern Clinical Psychiatry* 513 (1963) ; *American Handbook of Psychiatry* Ch. 73 "Hypnotherapy" by Lewis R. Wolberg (Arieti ed. 1959) ; *Comprehensive Textbook of Psychiatry* § 34.34 "Hypnosis: An Adjunct to Psychotherapy" by Herbert Spiegel (Freedman & Caplan eds. 1967).

We hold that on the facts of this case the testimony of Mildred Coley was sufficient to support a jury's verdict that Hard-

ing was guilty of the crime of attempted rape. In so holding we go no further than is required by those facts. The following evidence was adduced:

(1) the hypnosis procedure was fully exposed in the evidence; (2) the man who induced the hypnosis was a professional psychologist and gave his opinion that there was no reason to doubt the truth of the witness' statement; (3) there was sufficient corroboration of the witness' testimony: (a) male sperm was found in the victim's vagina, (b) the accused was one of two males shown to have known where the victim could have been found when the crime was committed, (c) the accused was seen in a station wagon immediately prior to the time the crime was committed. In addition, a precautionary instruction was given.

Finally Harding contends that the evidence was insufficient to support his conviction of assault with intent to murder. The record shows that Harding shot the victim in the chest, placed her on an abandoned road in an isolated area and prevented others from assisting her. It is difficult to imagine a stronger case, but may be well noted that specific intent to kill is not a necessary element for a conviction of assault with intent to murder. An intent to commit grievous bodily harm is sufficient, *McFadden v. State,* 2 Md. App. 725, 237 A. 2d 93, *Lawrence v. State,* 2 Md. App. 736, 237 A. 2d 81.

*Judgments affirmed.*