PEOPLE v. SUMMERS

1. CRIMINAL LAW—CONFESSION—VOLUNTARINESS—DETERMINATION—APPEAL AND ERROR.

The Court of Appeals must examine the entire record of a hearing given to determine whether a confession was voluntary, and make its own independent determination of voluntariness.

2. SAME—CONFESSION—VOLUNTARINESS—EVIDENCE.

Defendant's confessions, one to police and one to a prosecutor, that he committed a homicide *held,* not voluntarily given, where there was evidence that shortly before his arrest defendant had been drinking heavily, that defendant was mentally ill and mentally deficient and had never finished grammar school, that defendant was never advised of his right to remain silent and to be assisted by an attorney, that defendant was struck

REFERENCES FOR POINTS IN HEADNOTES

[1, 3] 29 Am Jur 2d, Evidence § 590.
[2] 29 Am Jur 2d, Evidence §§ 529, 555–557, 566, 567, 575–577.
[4] 39 Am Jur, New Trial §§ 113, 139.

by a person whom he had claimed committed the homicide in question when the police arranged a confrontation between the two of them, and defendant claimed that he was beaten and threatened by the police after his arrest.

3. SAME—CONFESSION—VOLUNTARINESS—STATE OF MIND.

A reviewing court attempts to determine the state of mind of the person giving a confession in making a determination of the voluntariness of the confession.

4. SAME—CONFESSION—VOLUNTARINESS—EVIDENCE—NEW TRIAL.

The introduction of an involuntary confession is never harmless error, and defendant in a criminal case is entitled to a new trial even though there is substantial evidence, apart from any confession, tending to demonstrate his guilt, when an involuntary confession has been introduced in evidence.

Appeal from Recorder's Court of Detroit, Krause (Paul A.), J. Submitted Division 1 January 12, 1968, at Detroit. (Docket No. 3,422.) Decided December 31, 1968.

Henry Lee Summers was convicted of murder in the first degree. Defendant appeals. Reversed and remanded for a new trial.

*Frank J. Kelley*, Attorney General, *Robert A. Derengoski*, Solicitor General, *William L. Cahalan*, Prosecuting Attorney, *Samuel A. Torina*, Chief Appellate Lawyer, *Angelo A. Pentolino*, Assistant Prosecuting Attorney, for the people.

*Albert Summer*, for defendant on appeal.

LEVIN, J. On November 28, 1958, the defendant, Henry Lee Summers, was convicted by jury verdict of the first-degree murder of Barbara Watkins. Two written confessions were introduced at the trial over objection. One of the two written confessions was given to police detectives, the other to the prosecutor.

In 1965 the defendant was granted a *Walker* hearing[1] concerning the voluntariness of the confessions. On October 8, 1965, the judge who conducted the hearing filed a lengthy opinion holding that both confessions were freely and voluntarily made and there was no error in their introduction into evidence during defendant's 1958 trial.

On this appeal we are required to "examine the entire record and make an independent determination of the ultimate issue of voluntariness." *Davis* v. *North Carolina* (1966), 384 US 737, 741, 742 (86 S Ct 1761, 1764, 16 L Ed 2d 895, 898). See, also, *Clewis* v. *Texas* (1967), 386 US 707, 708 (87 S Ct 1338, 1339, 18 L Ed 2d 423, 426); *Greenwald* v. *Wisconsin* (1968), 390 US 519 (88 S Ct 1152, 20 L Ed 2d 77); *People* v. *Hamilton* (1960), 359 Mich 410, 418; *People* v. *Pallister* (1968), 14 Mich App 139; and the discussion of the clearly erroneous rule in 2 Honigman & Hawkins, Michigan Court Rules Annotated (2d ed), p 596.

At 2:45 a.m. on November 7, 1957, the defendant was stopped on the street by police officers. He appeared to be concealing items under his topcoat and had dry blood on his face. His right knuckles were cut and bloody. He appeared to have been drinking. He was found to be carrying a radio, an electric clock, a lady's watchband, a coin purse, and a set of keys, all in a blood-spattered pillow case. He was arrested and held on suspicion of breaking and entering. The place of arrest was approximately three-quarters of a mile from the scene of Mrs. Watkins' murder.

Shortly after the defendant was arrested, the neighborhood police station to which he was taken received word that the Watkins' apartment was in disarray, that there was blood on Mrs. Watkins'

---

[1] *People* v. *Walker* (On Rehearing, 1965), 374 Mich 331.

bed and that she was missing. A search commenced.
Her nearly nude body was discovered near the apart-
ment building at approximately 7 a.m.

At 6 a.m. the defendant was questioned regarding
the then unexplained disappearance of Mrs. Wat-
kins. During the questioning he was confronted
with an acquaintance, one James Davis. The two
were among the last to see Mrs. Watkins alive.
There was testimony at the trial that all three had
been drinking alcoholic beverages together shortly
before her apparent hour of death.

Davis said he left the defendant with Mrs. Wat-
kins. Conversely, the defendant told the police
Davis was still with Mrs. Watkins when he, the
defendant, departed their company.

The police brought Davis and the defendant to-
gether. The defendant was asked to repeat his
charge that Davis was still with Mrs. Watkins when
the defendant left her. The defendant obliged,
whereupon Davis struck the defendant. The testi-
mony was in dispute whether the police left the
room after requesting the defendant to repeat the
charge and how quickly the police intervened to
separate the two. Both Davis and the defendant
testified that the police left the room but this was
denied by the police.

At the preliminary examination, at the trial, and
at the *Walker* hearing, the defendant asserted he
was beaten by police officers at the station house
to which he was taken when apprehended.

The following considerations are relevant to the
claim that the statements were involuntary:

(a) The defendant claimed he was beaten by po-
lice officers. This they denied.

(b) He also charged he was threatened by police
officers. This too was denied by several officers, but
one of the officers at the station house where he

was first taken testified that he didn't recall whether he had made threats, that he may have, and conceded that he may have threatened other accused persons on other occasions.[2]

(c) Defendant was struck by James Davis who defendant asserts was deliberately turned loose on him by the police officers. The same police officer who could not remember whether he threatened the defendant conceded that Davis struck the defendant but maintained that he, the officer, intervened immediately. He testified that he did not expect Davis to strike the defendant when he brought them together, that his intention was to have them confront each other after they had both been made aware of their contradicting statements. He knew that both had been drinking prior to their arrests.

(d) The defendant's clothing was taken away from him and replaced with coveralls. He was not supplied with a new pair of shoes and accompanied the detectives from police headquarters to the prosecutor's office barefooted on a cold day.[3]

(e) It was conceded that the defendant was not advised of his right to remain silent or of his right to counsel.[4]

---

[2] Threats of physical violence have been held to render involuntary a confession obtained thereafter. *Sims* v. *Georgia* (1967), 389 US 404 (88 S Ct 523, 19 L Ed 2d 634); *Beecher* v. *Alabama* (1967), 389 US 35 (88 S Ct 189, 19 L Ed 2d 35); *Payne* v. *Arkansas* (1958), 356 US 560 (78 S Ct 844, 2 L Ed 2d 975). See, also, *Haynes* v. *Washington* (1963), 373 US 503 (83 S Ct 1336, 10 L Ed 2d 513), where, although the police officer could not "remember" whether the defendant had asked to call his wife, he conceded that the defendant "could have" made such a request. The court's response was: "No legal alchemy can transmute such wholly equivocal testimony into a denial or refutation of the petitioner's specific recitation of the events." *Id.*, p 510.

[3] See *Payne* v. *Arkansas, supra* (The accused person was taken by automobile without shoes and socks a distance of 45 miles). See, also, *Brooks* v. *Florida* (1967), 389 US 413 (88 S Ct 541, 19 L Ed 2d 643); *Malinski* v. *New York* (1945), 324 US 401 (65 S Ct 781, 89 L Ed 1029).

[4] In *Clewis* v. *Texas* (1967), 386 US 707, 709 (87 S Ct 1338, 1339, 18 L Ed 2d 423, 426), the United States Supreme Court declared:

(f) At the time of his arrest the defendant was 22 years of age and had been in Detroit about 5 months visiting relatives. Defendant said that during his childhood he suffered many injuries on his head, and there was medical testimony that brain damage might have been caused thereby. Defendant attended ungraded classes in grammar school. He never actually passed any certain grade and did not graduate from grammar school. He did not attend regular junior high or high school classes; he attended a trade school. Both the people's and the defendant's psychiatric witnesses testified that the defendant was mentally ill.[5]

(g) Shortly before his arrest the defendant had been drinking heavily.[6]

---

"The trial of this case was prior to the date of decision of *Miranda v. Arizona* (1966), 384 US 436 (86 S Ct 1602, 16 L Ed 2d 694, 10 ALR3d 974) the requirements of which, therefore, are not directly applicable, *Johnson* v. *New Jersey* (1966), 384 US 719 (86 S Ct 1772, 16 L Ed 2d 882), although [such requirements are] relevant on the issue of voluntariness, *Davis* v. *North Carolina* (1966), 384 US 737 (86 S Ct 1761, 16 L Ed 2d 895)."

See, also, *Greenwald* v. *Wisconsin, supra; Haynes* v. *Washington, supra; Reck* v. *Pate* (1961), 367 US 433 (81 S Ct 1541, 6 L Ed 2d 948).

[5] See *Sims* v. *Georgia, supra* (defendant was illiterate with only a third grade education whose mental capacity was decidedly limited); *Davis* v. *North Carolina, supra* (defendant had a third or fourth grade education); *Gallegos* v. *Colorado* (1962), 370 US 49, 54 (82 S Ct 1209, 8 L Ed 2d 325, 87 ALR2d 614) (14-year-old boy "cannot be compared with an adult in full possession of his senses and knowledgeable of the consequences of his admissions"); *Reck* v. *Pate, supra* (19-year-old with the intelligence of a 10-year-old who had never completed the seventh grade and who had been repeatedly characterized as mentally retarded and deficient); *Culombe* v. *Connecticut* (1961), 367 US 568 (81 S Ct 1860, 6 L Ed 2d 1037) (33-year-old illiterate with a mental age of 9 to 9–1/2 years and an I.Q. of 64 characterized as mentally defective).

[6] The defendant's exact state of intoxication was in dispute. The defendant said he was "stoned" and "helpless." One arresting officer said the defendant appeared to have been drinking but could not properly have been arrested for drunkenness; he was able to walk and was coherent. Another officer said he appeared to have been drinking heavily. Several hours later an officer smelled liquor on the defendant's breath. The testimony of the defendant's drinking partners leads to the conclusion that at least 3 quart bottles of wine were obtained and consumed and perhaps more. See, Intoxi-

(h) No effort was made by the police to communicate with the defendant's relatives. There was a dispute whether telephone privileges were available to him.[7]

(i) Although the defendant was arrested on November 7, 1957, he was not taken before a magistrate until November 12, 1957, when the preliminary examination was conducted.[8]

Some time after 8 a.m. and before 9:30 a.m. of the morning he was arrested the defendant was taken from the neighborhood station house to the homicide division at main police headquarters downtown. It is the defendant's claim that the alleged mistreatment at the neighborhood station house softened him up to the point that he had no will to resist after he was taken downtown and confronted by detectives in a small room.

The detectives obtained a written confessional statement in a 22-minute interview commencing at 9:55 a.m. and concluding at 10:17 a.m. Immediately thereafter the defendant was taken across the street to the prosecutor's office where he gave a lengthy confessional statement commencing at 10:45 a.m.

Among the first questions asked by the prosecutor and the defendant's responses were:

"*Q.* And are you going to tell me these things of your own free will?

"*A.* I have no choice, got to tell you of my own free will.

---

cated Confessions: A New Haven in *Miranda,* 20 Stan L Rev 1269 (1968) for a discussion of both pre- and post-*Miranda* cases.

[7] For cases holding that an accused person's detention incommunicado is a relevant factor see *Brooks* v. *Florida, supra; Sims* v. *Georgia, supra; Davis* v. *North Carolina, supra; Haynes* v. *Washington, supra; Gallegos* v. *Colorado, supra; Beck* v. *Pate, supra; Payne* v. *Arkansas, supra; Malinski* v. *New York, supra.*

[8] Although the disputed confession was made the morning after the arrest and therefore the unexplained delay in arraignment was not in order to sweat out a confession (see *People* v. *Hamilton* [1960], 359 Mich 410), this circumstance is nevertheless of some relevance in appraising the totality of the circumstances.

"*Q.* Well, you have a choice to tell me or not to tell me but do you want to tell me what happened and answer my questions?

"*A.* Yeah, I will tell you.

"*Q.* All right. How have you been treated by the police since you have been in custody?

"*A.* How was I treated?

"*Q.* How have you been treated?

"*A.* Oh, they beat the hell out of me.

"*Q.* When did they beat you?

"*A.* Oh, they beat me all last night and beat me today down here."

The defendant then proceeded to relate his version of the events leading up to Mrs. Watkins' death. After the statement was more or less complete the defendant was asked about the earlier statement which he had given the detectives. He conceded that he had signed such a statement and that those officers had treated him fairly. The questioning continued:

"*Q.* Well, did you tell Harris [one of the 2 detectives to whom the statement was given] what happened last night?

"*A.* He beat the hell out of me, I had to tell them what happened.

"*Q.* Who beat the hell out of you?

"*A.* I don't know, some old short guy.

"*Q.* Was it Harris?

"*A.* I don't know, man.

"*Q.* Was it this officer here?

"*A.* No, it was not him. I got kicked, I got stomped when I was in the building here. * * *

"*Q.* Now, Henry, what you have told me, is that the truth as to what happened last night, all of it?

"*A.* I guess so, I don't know.

"*Q.* Well, is it?

"*A.* I can't swear on it.

"*Q*. I'm sorry?

"*A*. I can't swear on it.

"*Q*. What part can't you swear to?

"*A*. None of it.

"*Q*. Is it all a lie that you have told me?

"*A*. I am going to tell you like it is.

"*Q*. All right.

"*A*. I done got whipped and banged around enough here, so anything I can say—so you can take it as you want, but I will get my lawyer—I will deny anything I say.

"*Q*. That's what you intend to do is get a lawyer?

"*A*. Yes, that's what I intend to do.

"*Q*. You understand that I want you to tell the truth?

"*A*. I am going to tell you about the D. A.s in New York. You are arrested—

"*Q*. (*Interposing*) I don't want you to tell me about the D. A.s in New York. What I want to know is what you have told me just now the truth?

"*A*. Yeah.

"*Q*. It is?

"*A*. Yes.

"*Q*. Is it, Henry?

"*A*. Yeah.

"*Q*. Well then, why are you going to deny it when you get a lawyer?

"*A*. Because in New York, the D. A. comes up there—

"*Q*. (*Interposing*) No.

"*A*. Can't I say that? The D. A. winks his eye at the cop and they take you out and beat the hell out of you and bring you back and make you tell a lie.

"*Q*. Well now, tell me again, is what you have told me this morning, is that the truth as to what happened last night.

"*A*. Yeah, I guess all is the truth.

"*Q*. All of it is the truth, Henry?

"*A*. Yeah.

"*Q.* Well then, why are you going to deny it when you get a lawyer?

"*A.* Just going to deny it.

"*Q.* All right. Do you have any complaints to me about the way that Harris treated you at all? That's this officer right here.

"*A.* He was real nice.

"*Q.* And is he the first one that you told about the murder?

"*A.* Yeah. I was telling the other guy a lie, but he came and talked to me like a man, and I told him the truth; but the cop, bang, bang, whipped me all over the place.

"*Q.* And did you tell the other cop what happened?

"*A.* I just doubled up for the fun of it.

"*Q.* And did you tell the other cop what happened?

"*A.* Uh-uh.

"*Q.* But Harris treated you all right, like a man?

"*A.* He treated me all right.

"*Q.* So you decided to tell him the truth?

"*A.* That's right.

"*Q.* What you did tell him was the truth?

"*A.* Uh-huh."

We are persuaded, on our own independent examination of this record, that neither written confession was voluntary.

In reviewing a presented issue of voluntariness of a confession, the reviewing court attempts to determine the declarant's state of mind when he confessed.[9] This difficult task is simplified in the case at bar because the defendant's recorded statements as he gave his statement to the prosecutor clearly showed his mental state. We are persuaded that either Summers had been beaten, as he asserted, or he was disoriented,[10] or in fear, or did not desire to

[9] *Culombe* v. *Connecticut, supra.* See, also, Developments in the Law—Confessions, 79 Harv L Rev 935 (1966).

[10] *Cf. Beecher* v. *Alabama, supra.*

give a statement. Whatever interpretation one puts on the evidence, intrinsic and extrinsic, the statement given to the prosecutor was not a free and voluntary statement. A finding of voluntariness cannot reasonably be reconciled with statements to the contrary on the face of the confession.

Even if the defendant's detailed recital of the events leading up to Mrs. Watkins' death, as set forth in his confessions, was entirely true, that fact has no bearing on the admissibility of those confessions. Where an involuntary confession has been introduced at trial, the defendant is entitled to a new trial even though there is substantial evidence, apart from the confession, tending to demonstrate his guilt. The introduction of an involuntary confession is never harmless error. *Lynum* v. *Illinois* (1963), 372 US 528, 537 (83 S Ct 917, 9 L Ed 2d 922).[11]

Considering the totality of the circumstances (*Clewis* v. *Texas, supra; Greenwald* v. *Wisconsin, supra*), the defendant's mental condition, failure to advise him of his right to remain silent and his right to counsel, the physical attack by a person put by the police in the same room with the defendant to confront him with his claim that such person was implicated, the indignities which appear on this record, we are left with the definite and firm conviction that the confession given the police detectives as well as the confession made to the prosecutor was involuntary and have, therefore, concluded that the trial judge's finding of voluntariness was clearly erroneous. GCR 1963, 517.1. See *People* v. *Pallister, supra; People* v. *Walker* (1967), 6 Mich App 600, 602.

---

[11] *Rogers* v. *Richmond* (1961), 365 US 534, 540, 541 (81 S Ct 735, 5 L Ed 2d 760); *Jackson* v. *Denno* (1964), 378 US 368, 384, 385 (84 S Ct 1774, 12 L Ed 2d 908, 1 ALR3d 1205); *Haynes* v. *Washington, supra*, p 518; *Payne* v. *Arkansas, supra*, p 568.

The defendant's conviction and sentence of first-degree murder are set aside and the cause remanded for a new trial at which neither confession may be admitted in evidence.[12]

T. G. KAVANAGH, P. J., and BEER, J., concurred.

[12] Since neither confession will be admissible at the defendant's new trial, the question whether the *Miranda* warning requirement applies to retrials of cases originally tried before the *Miranda* decision will not arise. See *People* v. *Marsh* (1968), 14 Mich App 518; *Jenkins* v. *Delaware,* — Del — (230 A2d 262, 240 A2d 146), *affirmed* (1969), 395 US 213 (89 S Ct 1677, 23 L Ed 2d 253).