PEOPLE v HANGSLEBEN

Docket No. 77-3165. Submitted June 7, 1978, at Grand Rapids.— Decided November 6, 1978.

Defendant Bradley L. Hangsleben was convicted of two counts of second-degree murder in the Saginaw Circuit Court, Joseph R. McDonald, J. During the investigation of the killings the police questioned defendant at various times and locations and eventually procured several incriminating admissions which were admitted at trial. Defendant testified that he was at the scene the night of the killings but that a third person had committed the murders. He claimed that at the time the police questioned him he did not remember what had happened but that at the time of trial he did remember. He sought to introduce statements he made to a psychiatrist who hypnotized and questioned him. The trial court disallowed these statements and any reference to hypnosis. Defendant appeals. *Held:*

1. The police adequately warned defendant of his rights prior to the interrogation which elicited the incriminating statements and prior interrogations were consistent with proper investigative interrogation of witnesses requiring no warning.

2. The Court of Appeals will not overturn a trial court's determination of the voluntariness of a defendant's statements to police unless it is left with a firm and definite conviction that a mistake has been made; in this case the Court was not convinced.

3. Statements of a defendant while under hypnosis were inadmissible to establish the truth of the statements while under the hypnotic trance or to bolster the credibility of defendant's story at trial by arguing that the hypnosis had a mind-jogging effect, which would help explain defendant's earlier inconsistent admissions to police; such statements are never admissible for the former purpose because they are unreliable and any reference to hypnosis was not permissible in

REFERENCES FOR POINTS IN HEADNOTES

[1, 3] 29 Am Jur 2d, Evidence §§ 611-613.
[2] 29 Am Jur 2d, Evidence §§ 529, 543, 582.
[4] 29 Am Jur 2d, Evidence § 831.

this case for the latter purpose because no general scientific acceptance of hypnosis as a mind-jogging technique had been shown.

Affirmed.

1. APPEAL AND ERROR—CRIMINAL LAW—STATEMENTS OF DEFENDANT— VOLUNTARINESS—DETERMINATION.

The Court of Appeals must examine the entire record of a hearing held to determine whether a statement was voluntary and make its own independent determination of voluntariness.

2. APPEAL AND ERROR—CRIMINAL LAW—STATEMENTS OF DEFENDANT— VOLUNTARINESS—STATE OF MIND.

A reviewing court attempts to determine the state of mind of the person giving a statement in making a determination of the voluntariness of the confession.

3. APPEAL AND ERROR—CRIMINAL LAW—STATEMENTS OF DEFENDANT— VOLUNTARINESS.

The Court of Appeals will not overturn a trial court's determination of the voluntariness of a defendant's statements to police unless it is left with a firm and definite conviction that a mistake has been made.

4. CRIMINAL LAW—STATEMENTS OF DEFENDANT—HYPNOSIS—STATEMENTS MADE UNDER HYPNOSIS.

Statements of a defendant while under hypnosis were inadmissible to establish the truth of the statements while under the hypnotic trance or to bolster the credibility of defendant's story at trial by arguing that the hypnosis had a mind-jogging effect, which would help explain defendant's earlier inconsistent admissions to police; such statements are never admissible for the former purpose because they are unreliable and any reference to hypnosis was not permissible in this case for the latter purpose because no general scientific acceptance of hypnosis as a mind-jogging technique had been shown.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Robert L. Kaczmarek,* Prosecuting Attorney, and *Peter C. Jensen,* Assistant Prosecuting Attorney, for the people.

*Daniel R. Connell, Joseph H. Hans* and *Robert B. Currie,* for defendant.

Before: Danhof, C.J., and V. J. Brennan and R. H. Campbell,* JJ.

Danhof, C.J. This case arises from the June 1, 1976, slaying of two young girls at their home in Buena Vista Township, Saginaw County. Defendant, a teenage boy who lived across the street from the victims' home, was charged with the murders on June 17, 1976. From the time of the murders until the time he was charged, defendant had repeated contacts with police, primarily with Detective William Browne of the Buena Vista Police Department, the chief investigator of the girls' murder. Browne interviewed defendant at various times and locations, ultimately procuring several incriminating admissions.[1] Tapes of these interviews were played at trial. To the jury defendant denied killing the girls. He testified that he was in their home the night of the murders, but that a third person had committed the crimes. He claimed he did not remember what had happened when he spoke to police, but did recall the actual events at trial. The jury found defendant guilty of two counts of second-degree murder, as defined by MCL 750.317; MSA 28.549. The trial judge sentenced defendant to two concurrent terms of life in prison.

On appeal as of right, defendant raises a host of alleged errors by the trial court. Our research and analysis reveals that only three of his arguments merit a nonsummary response: (1) whether any admissions used against defendant were the prod-

---

* Circuit judge, sitting on the Court of Appeals by assignment.

[1] There was a conflict between defense and prosecution witnesses whether defendant actually admitted killing the girls. He did admit being in the house the night of the murder. He also described the clothes he wore the night of the murder, which were later discovered in his home spotted with blood, and drew pictures of various implements which were used in the commission of the crime.

ucts of "inherently coercive" interrogations, in violation of *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1965); (2) whether any admissions used against defendant at trial were involuntarily made; and (3) whether any evidence obtained by or references to an examination of defendant while under hypnosis were admissible at trial. We decide all three issues in favor of the people.

## I

### THE ADMISSIBILITY OF DEFENDANT'S STATEMENTS TO POLICE.

As an admissions problem, the instant case is factually complex and is complicated by the defense's imprecise presentation of the issues.

Defendant claims he made incriminating statements during at least nine separate contacts with police, some before he was warned of his constitutional rights, some after. Rather than informing the trial court precisely what incriminating statements were made during this series of interviews, and explaining how they could be used at trial to establish his guilt or could have been used before trial to obtain other incriminating statements, defendant generally sought to suppress all statements by him, during any meeting with police from June 1 to June 10. His theory is that all were obtained either involuntarily, through a scheme to harass, badger and mislead, or in violation of *Miranda,* either directly as part of a primary illegality or indirectly as "fruits of a poisonous tree." After a *Walker*[2] hearing, the trial court denied defendant's motion.

[2] *People v Walker (On Rehearing),* 374 Mich 331; 132 NW2d 87 (1965).

It is undisputed that Officer Browne interviewed defendant twice, along with other neighbors, at the scene of the crime on June 1, and once again at the Buena Vista Police Department on June 4, before warning defendant of his constitutional rights. The nature of the questions each time was similar: Browne inquired where defendant had been the night of the murders and what he had seen, heard, or knew of the killings.

Defendant alleged a fourth similar meeting without *Miranda* warnings on June 5, at a police field station set up in the Buena Vista Red Roof Inn.[3] Contrary to his testimony at the *Walker* hearing, defendant averred at trial that Officer Browne, in the Red Roof Inn meeting, accused defendant of discrepancies in his prior statements. Officer Browne acknowledged the field station at the Red Roof Inn, but denied the interview with defendant there on June 5.

At noon, on June 8, Officer Browne took defendant to the Buena Vista Police Station for fingerprinting, but did not detain him. That evening defendant met with Officer Browne at a second field station in the Buena Vista Holiday Inn. Prior to interviewing defendant there, Officer Browne gave the *Miranda* warnings. At that meeting, Officer Browne told defendant that his fingerprints had been found in the victims' home, that defendant had been lying, and, for the first time, that defendant was in trouble. Browne taped the interview and also took hair and fingerprint samples. Although defendant was not arrested, at that point, he no doubt had become a primary suspect.

The following evening, June 9, Officer Browne drove defendant to the Bay City State Police Post

---

[3] The field station had been employed to avoid station house confusion which had been generated by the murder investigation.

for a lie detector examination. Before administering the test, the polygraph operator read defendant his constitutional rights. After the examination the operator and his supervisor questioned defendant further, obtaining defendant's admission that he was in the house the night of the murders. The supervisor claimed that he readvised defendant of his constitutional rights, which claim defendant denies. There is also conflicting testimony whether defendant at that time called for Officer Browne and told him he killed the girls. It is certain that sometime after the polygraph examination, either at the State Police Post or during the return trip to Buena Vista, defendant described the clothes he was wearing the night of June 1 and said they were spotted with blood. The police obtained a warrant and defendant's consent to search his parent's home for this evidence. While Officer Browne and other investigators executed the warrant, defendant remained at the police station. When the investigators returned, they took defendant to the Holiday Inn field station, where they recorded his statements during a three hour interview, which lasted until 4 a.m., June 10. Both sides agreed that Officer Browne adequately warned defendant of his rights prior to this last interview.

A. *The Miranda Issue*

The present debate of whether the entitlement to *Miranda* warnings in Michigan rests on focus or custody, compare *People v Martin,* 78 Mich App 518; 260 NW2d 869 (1977), with *People v Robinson,* 79 Mich App 145; 261 NW2d 544 (1977),[4] is not now before us. That issue was not briefed and its resolution is unnecessary to our decision, as we

---

[4] The Federal standard is now clearly "custody". *Beckwith v United States,* 425 US 341; 96 S Ct 1612; 48 L Ed 2d 1 (1976).

find that *Miranda* warnings were excused during the initial encounters between defendant and police under either test.

"Custody" does not necessarily entail police house confinement; it rests primarily on a finding that defendant was not free to go after questioning. Kamisar, *"Custodial Interrogation" within the Meaning of Miranda,* Crim Law & the Constitution, 335, 362 (Reed, *et al.,* eds., 1968).[5] The "focus" inquiry is interrelated with the inquiry of probable cause for arrest. See *People v Ridley,* 396 Mich 603, 608; 242 NW2d 402, 405 (1976), *Kamisar, supra.* The evidentiary bases for both findings may overlap.[6]

Collectively the following facts indicate that, until the June 8 interview at the Holiday Inn, the Buena Vista police were engaged only in preliminary exploration and defendant remained free to go. Police never handcuffed or otherwise physically restrained defendant. They did not detain, threaten to detain or have probable cause to detain him at that time. Defendant was asked general investigatory questions, consistent with his being a witness as well as a suspect. Others were questioned with him at the scene of the crime and, according to defendant, at the Red Roof Inn. The June 4 interview at police headquarters was prompted by defendant's own phone call, he travelled there by his own means. Defendant did not believe he was under arrest until the morning of June 10.

---

[5] Professor Kamisar suggests three standards by which to make that finding: (1) the subjective belief of the defendant, (2) the subjective intent of the police, and (3) the objective belief of a reasonable man.

[6] Thus, for example, probable cause for arrest may evidence that the police had focused on one suspect and also that they intended to detain him.

Finding no primary illegality, it is unnecessary to determine whether any statements taken from these initial interviews were used at trial or whether defendant's later admissions were fruits of the earlier ones.

The trial court declined to enter an order as to the alleged June 5 meeting at the Red Roof Inn, reasoning that since the prosecutor denied the interview, he could not introduce any evidence of it at trial. Although the so-called "fruits of the poisonous tree" doctrine casts a shadow upon this logic, see *People v Robinson,* 48 Mich App 253; 210 NW2d 372 (1973), but see *Michigan v Tucker,* 417 US 433; 94 S Ct 2357; 41 L Ed 2d 182 (1974), we find no reversible error in the court's conclusion, as the meeting on the above facts would also have to be considered part of a preliminary investigation. Even defendant's testimony at trial—that Officer Browne there accused him of lying—does not make out a case of focus or custody. At the preliminary exploration stage the police must be expected to check on witnesses' stories and requestion those whose stories have been contradicted, in an effort to ascertain the true facts. A witness does not automatically become a suspect if there is a discrepancy in any part of his story. Nothing on the record shows that the parts of defendant's story, which supposedly did not check out, necessarily had implicated him in the crime.

B. *The Voluntariness Issue.*

In accord with *People v McGillen #1,* 392 Mich 251; 220 NW2d 677 (1974), we have reviewed the entire transcript of defendant's *Walker* hearing, and have independently assessed the voluntariness of defendant's statements. An attempt has been made to ascertain the defendant's state of mind when he spoke to police, accord, *People v Sum-*

*mers,* 15 Mich App 346; 166 NW2d 672 (1968), to determine whether his statements were products of a free and unconstrained choice, accord, *United States v Brown,* 557 F2d 541 (CA 6, 1977). In making that determination we have read the record with an eye towards evidence of the duration and conditions of the interviews, the attitude of police towards defendant, defendant's physical and mental state, and any other pressures which may have undermined defendant's free will. Accord, *People v Allen,* 8 Mich App 408, 412; 154 NW2d 570, 572 (1967).

Weighing against the admissibility of defendant's statements, we find evidence that police questioned defendant a substantial number of times (at least 8 times in 10 days); that contact was prolonged on the final occasion (June 9–10) for approximately 9 hours, during which time defendant was interrogated for approximately 6 hours without sleep, until early in the morning; and that police interrogated defendant without counsel or family present, at times in a foreign city. Coercion is also suggested by the facts that defendant was only 19 years old and was upset and crying during the final interview. Evidencing that his free will may have been undermined was defendant's testimony that the polygraph operator yelled at him and accused him of lying, and that defendant subjectively feared he would be beaten if he did not confess.

Contrary to defendant's assertion we do not find that the use of a polygraph in the course of interrogation necessarily renders his subsequent confession involuntary. Accord, *United States v McDevitt,* 328 F2d 282, 284 (CA 6, 1964).

In favor of the trial court's findings is evidence that police timely warned defendant of his consti-

tutional rights, never handcuffed him, and did not detain him until after the June 9 admissions; that police did not use or threaten physical force nor make any promises; that the prolonged interrogations on June 9–10 were conducted in separate sessions of about 3 hours each, with a 3 hour break in between; and that during this 9 hour contact defendant was offered and accepted refreshment. As to defendant's personal circumstances, the record shows that he had a high school education and that while he was upset during the final hours, he was not extremely distraught.

Recognizing that it is impossible "precisely to delimit * * * the power of interrogation allowed to state law enforcement officers * * * ", *Culombe v Connecticut,* 367 US 568, 601; 81 S Ct 1860; 6 L Ed 2d 1037 (1961), we affirm the trial court's finding of voluntariness. This record does not leave us with a firm and definite conviction that a mistake has been made.

## II

### THE ADMISSIBILITY OF EVIDENCE OBTAINED BY OR REFERENCES TO HYPNOSIS.

Before presenting his case, defense counsel asked the court if he would be allowed to call a psychiatrist who had examined defendant after his arrest, to testify as to what defendant said while under hypnosis and to play a tape of that conversation. This testimony and tape would have related defendant's story that he was in the home the night of the murders, but that a third person had committed the killings. Alternatively, defense counsel asked if he could at least refer to the hypnosis sessions in his opening remarks (or in his

examination of defendant) to point out to the jury that defendant could not recall the events of the murder before hypnosis, but could recall them afterwards, and that that was after his confession. As a legal and factual foundation for the evidence, defense counsel offered an unappealed decision of the circuit court and stated that the proposed witness was a trained psychiatrist. The court denied both requests.

A proper analysis of the problem presented to the trial court by defendant's request, requires some elaboration of the possible purposes defendant sought to achieve by it. One purpose for introducing the evidence obtained by hypnosis would be to establish the truth of the statements made by defendant while he was under the hypnotic trance. A second use, apparent from defense counsel's alternative request, would be to bolster the credibility of defendant's story at trial by arguing that the hypnosis had a mind-jogging effect, which would help explain defendant's earlier inconsistent admissions to police.

As a matter of first impression in this state, we hold that evidence of a subject's responses while under hypnosis is inadmissible for either of these purposes. Courts in other jurisdictions have universally disallowed such evidence under the first theory, reasoning that it is unreliable. See Anno: *Physiological or Psychological Truth and Deception Tests,* 23 ALR2d 1306, § 4, p 1310, 29 Am Jur 2d, Evidence, § 831, p 924. Defendant does not argue reliability in this case beyond his assertion that the psychiatrist who administered the test was qualified. This is an inadequate foundation for scientific evidence under *People v Tobey,* 401 Mich 141; 257 NW2d 537 (1977).

Some courts have admitted evidence obtained by

hypnosis for other *limited purposes.* Thus, it has been held that an expert witness, in explaining his opinion of a defendant's state of mind or sanity at the time of a criminal offense, may relate the administration and results of hypnotic tests that were used as tools in the diagnosis. *E.g. People v Modesto,* 59 Cal 2d 722; 31 Cal Rptr 225; 382 P2d 33 (1963); See Anno: *Admissibility of Physiological or Psychological Truth and Deception Test or its Results to Support Physician's Testimony,* 41 ALR3d 1369. However, even among courts that allow such evidence for that purpose, there is a split as to whether the precise results, including testimony and tapes relating the subject's actual responses, may be introduced. See 41 ALR3d, *supra* at 1372. Assuming for the moment that some evidence relating to defendant's test under hypnosis would be admissible in this case for the limited purposes of enhancing his credibility, we agree with those courts that would exclude his actual responses. It was well within the trial court's discretion to determine that the dubious value those results might have in clarifying and supporting defendant's theory of memory restoration would be outweighed by the chance of misinterpretation and misuse by the jury. *Cf. State v White,* 60 Wash 2d 551; 374 P2d 942 (1962).

We also hold that under the circumstances of this case it was proper to exclude *any* references to hypnosis. In opposition to this view, defendant directs us to *Harding v State,* 5 Md App 230; 246 A2d 302 (1968), which also involved a witness who testified from her present memory, which had been restored by hypnosis. In *Harding,* however, the question was whether the witness should have been allowed to testify at all, and whether her testimony was sufficient to support defendant's

conviction for her rape. Warning that such testimony was suspect, since a subject under hypnosis was extremely susceptible to suggestion and yet capable of fantasizing, the court found no abuse in allowing the witness to testify, so long as the jury was cautioned about the inherent unreliability of her testimony. Accord, *Wyller v Fairchild Hiller Corp*, 503 F2d 506 (CA 9, 1974). Defendant notes that the *Harding* court emphasized that the witness's testimony had been corroborated by the physical evidence. That emphasis, however, was in support of the court's finding that the evidence was sufficient to support the conviction, despite the inherent untrustworthiness of the witness's testimony.

The issue here is whether a criminal defendant *may* inform the jury that his memory was restored by hypnosis. *Harding* suggests that any error in restricting defendant in this respect would be harmless, since any reference to hypnotic memory restoration would tend to impeach, rather than rehabilitate the credibility of a witness's present memory. Still, the facts of this case are sufficiently distinguishable so as to preclude a decision on the basis of nonreversible error. When both sides rested the jury was left essentially with a choice between defendant's earlier admissions as related by police and his story at trial. The physical evidence tended to corroborate both versions. On these facts the reference to hypnosis may have had the abnormal effect of enhancing rather than diminishing the witness's credibility.

Nevertheless, we find that references to defendant's examination while under hypnosis were properly excluded because defendant has also failed to establish the reliability of hypnosis as a memory-jogging device. As we have recited, the only fac-

tual foundation offered to the trial court was defendant's assertion that the witness was a qualified psychiatrist. In his brief defendant also quotes the Encyclopedia Britannica which merely defines hypermnesia and the theory of hypnotic memory restoration. That does not demonstrate the general scientific acceptance required by *People v Tobey, supra.* Absent an impartial showing that hypnosis has been successful in restoring the memory of persons other than defendant, either by testimony of other subjects or experts, the references in this case were properly rejected as being of tenuous probative value. *Cf. People v Busch,* 56 Cal 2d 868; 16 Cal Rptr 898; 366 P2d 314 (1961).

Affirmed.