## PEOPLE *v.* WERNER

1. C<small>RIMINAL</small> L<small>AW</small> — C<small>ONFESSIONS</small> — W<small>ALKER</small> H<small>EARING</small> — V<small>OLUN</small>-<small>TARINESS</small>.

 > The sole function of a *Walker* hearing is to determine the voluntariness of a confession; it is improper at the hearing to weigh the defendant's credibility in light of his innocence or guilt.

2. C<small>RIMINAL</small> L<small>AW</small> — C<small>ONFESSIONS</small> — V<small>OLUNTARINESS</small> — W<small>ALKER</small> H<small>EARING</small> — S<small>TANDARD</small> <small>OF</small> R<small>EVIEW</small>.

 > The standard of review to be used when a defendant contests the outcome of a *Walker* hearing is whether the trial court's finding was clearly erroneous.

3. A<small>PPEAL</small> <small>AND</small> E<small>RROR</small> — C<small>LEARLY</small> E<small>RRONEOUS</small> T<small>EST</small> — S<small>COPE</small> <small>OF</small> R<small>EVIEW</small>.

 > A trial judge can be reversed under the clearly erroneous standard, even though there was sufficient evidence to lead a reasonable man to the same result if the appellate court has the definite and firm conviction that a mistake has been committed.

4. C<small>RIMINAL</small> L<small>AW</small>—C<small>ONFESSIONS</small>—V<small>OLUNTARINESS</small>.

 > Finding that the defendant's confession was voluntary was not clearly erroneous where the defendant was twice warned of

R<small>EFERENCES FOR</small> P<small>OINTS IN</small> H<small>EADNOTES</small>

[1, 4] 29 Am Jur 2d, Evidence § 582 *et seq.*
[2] 29 Am Jur 2d, Evidence § 590.
[3] 5 Am Jur 2d, Appeal and Error § 867.
[5, 6] 29 Am Jur 2d, Evidence §§ 371, 372.

his constitutional rights before he made self-incriminating statements where the first time he was advised of his constitutional rights he stated that he understood the warnings, where there was no unnecessary delay in the arraignment, and where the defendant made his confession several hours after the arraignment.

5. CRIMINAL LAW — IDENTIFICATION — ADMISSIBILITY — PRE-TRIAL IDENTIFICATION.

An in-court identification of the defendant by the complainant was inadmissible where the complainant had made a pre-trial identification of the defendant, the confrontation in which the pre-trial identification was made was unnecessarily suggestive, and the record did not show by clear and convincing evidence that the in-court identification was not tainted by the prior illegal pre-trial identification.

6. CRIMINAL LAW — IDENTIFICATION — PRE-TRIAL IDENTIFICATION — DUE PROCESS — OVERLY SUGGESTIVE.

A pre-trial confrontation between the complainant and the defendant in which the complainant identified the defendant as his assailant was unnecessarily suggestive and violative of due process of law where the complainant, although in the hospital, was not in immediate danger of death, where the complainant had been told before the confrontation that the police were going to bring in someone for him to identify, where the defendant was brought into the room while handcuffed between two uniformed policemen, and where only the policemen, the defendant, and the complainant were in the room.

Appeal from Calhoun, Ronald M. Ryan, J. Submitted Division 2 June 18, 1970, at Lansing. (Docket No. 6,928.) Decided August 24, 1970.

Ernest David Werner was convicted of armed robbery. Defendant appeals. Reversed and remanded for new trial.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *John M. Jereck,* Prosecuting Attorney, and *William J. Stiner,* Chief Assistant Prosecuting Attorney, for the people.

*Stanley Everett,* for defendant.

Before: FITZGERALD, P. J. and R. B. BURNS and DANHOF, JJ.

DANHOF, J.  Following a jury trial, the defendant was found guilty of armed robbery, MCLA § 750.529 (Stat Ann 1970 Cum Supp § 28.797), and sentenced to a term of four to fifteen years in prison.

The robbery occurred shortly before 10:30 p.m. on February 24, 1968.  The victim was Leo King, the owner of the Community Grocery in Battle Creek, Michigan, who was assaulted and robbed of his money sacks and brief case as he was leaving his store.

On appeal a number of issues have been argued. The first is whether the confession of the defendant was voluntary and, therefore, properly admitted into evidence.

A timely motion to suppress certain statements made by the defendant to the police was filed.  What is known as a *Walker* hearing followed.[1]

"[T]he sole function of a *Walker* hearing is to determine the voluntariness of a confession, and it is improper to weigh defendant's credibility in light of his innocence or guilt." *People* v. *Hummel* (1969), 19 Mich App 266, 271.

The standard of review to be used when a defendant contests the outcome of a *Walker* hearing is whether the trial court's finding was clearly erroneous. *People* v. *Hummel, supra.*  Under the clearly erroneous standard a trial judge can be reversed even though there was sufficient evidence to lead a reasonable man to the same result if the appellate court has "the definite and firm conviction that a mistake has been committed." *People* v. *Summers*

---

[1] *People* v. *Walker* (On Rehearing, 1965), 374 Mich 331.

(1968), 15 Mich App 346, *People* v. *Pallister* (1968),
14 Mich App 139, *People* v. *Hummel, supra.*

The defendant was taken into custody between
10:30 and 11:00 p.m. on February 24, 1968.   It is
undisputed that one of the policemen read the
*Miranda*[2] warnings to the defendant in the squad car
on the way to the police station and that the defend-
ant said that he understood the warnings.   At that
time the defendant was 17 years old and a senior in
high school.

The transcript of the *Walker*-type hearing in this
case shows that the defendant arrived at the police
station about 11:30 p.m. on February 24, 1968, and
that he made his incriminating statements about 3:30
p.m. on February 25, 1968.   The defendant was in-
terrogated intermittently during this time, although
he was apparently not taken out of the bullpen from
about 3 a.m. to 7 a.m.   He was taken to a hospital
to confront the victim about 1:30 a.m.   Upon his
return to the station about 2:30 a.m. he was "booked"
and placed in a cell.   He was taken out of the bullpen
once to be inspected for an alleged bulge in his pants
and on another occasion to try on a red jacket.

The defendant was arraigned about 10:30 a.m. on
February 25, 1968.   He was offered the use of the
telephone and did use it.   The defendant was again
told of his constitutional rights by a police detective
just before he made his statements about 3:30 p.m.

It is our opinion that the trial judge was not clear-
ly erroneous in holding that the confession was vol-
untary and, therefore, admissible.   The defendant's
reliance on *People* v. *Hamilton* (1960), 359 Mich 410,
is misplaced as that case is distinguishable.   In that
case, four days elapsed between the time the defend-
ant was arrested and the time when he was ar-

---

[2] *Miranda* v. *Arizona* (1966), 384 US 436 (86 S Ct 1602, 16 L
Ed 2d 694, 10 ALR 3d 974).

raigned. The Court held that the defendant's detention was unlawful because the delay was unnecessary and also because its manifest purpose was that of "sweating" a confession. Additionally, there was undisputed proof that defense counsel was refused even a limited conference during the detention and the Court held that this amounted to a denial of due process. The Court carefully went on to point out that they were not holding that an arrested person could not be "booked" and questioned for such time of "brief delay", as the circumstances required, in order to determine the immediate question of release or complaint.

The record in the instant case does not show any unnecessary delay in arraigning the defendant and he did not confess until several hours after the arraignment so the *Hamilton* case is not controlling.

The second issue on appeal is whether the in-court identification of the defendant by the victim was admissible. Again, timely[3] objection was made by the defense counsel and a *Wade*[4] hearing was held upon the admissibility of the in-court identification. It is the defendant's position that the hospital confrontation between him and the victim was unnecessarily suggestive in nature; thus, denying him due process of law. He further alleges that although the victim claimed to make the identification independent of the hospital confrontation that, in fact, his own testimony indicates otherwise.

At the beginning of the hearing it was agreed by both counsel for the people and for the defendant that the attending doctor's testimony indicated that he did not think the victim was in immediate danger of death at the time of the confrontation in the hos-

---

[3] *People* v. *Childers* (1969), 20 Mich App 639.
[4] *United States* v. *Wade* (1967), 388 US 218 (87 S Ct 1926, 18 L Ed 2d 1149).

pital. It is our opinion that this agreement as to the victim's physical condition makes the present case factually distinguishable from *Stovall* v. *Denno* (1967), 388 US 293 (87 S Ct 1967, 18 L Ed 2d 1199).

The facts pertinent to the hospital confrontation as stated by Mr. King are that his brother and also a police officer had told him that the police were going to bring in a person for him to identify, that when the defendant walked into the victim's hospital room he was in handcuffs between two uniformed policemen, and there was no one else in the room. It is our opinion that this hospital room confrontation was so unnecessarily suggestive as to violate due process of law, especially since the victim's life was not in danger at that time. "It is hard to imagine a situation more clearly conveying the suggestion to the witness that the one presented to the witness is believed guilty by the police." *United States* v. *Wade* (1967), 388 US 218 (87 S Ct 1926, 18 L Ed 2d 1149). Therefore, the in-court identification of the defendant based on this prejudicial hospital confrontation should not have been allowed unless the hearing held on this issue showed that the victim had an independent source of identification separate from the hospital confrontation. *People* v. *Young* (1970), 21 Mich App 684.

The victim's own testimony as to the identification shows confusion, imperfect memory, and contradictions. An illustrative portion of it follows:

(*Questions by the court*):
"*Q*. So as I understand it, you were outside the building when you were hit on the head or in the fact [face?] from somebody behind you, and you had already locked the door?
*A*. Yes.
*Q*. So when you were hit you were knocked out temporarily were you?
*A*. Yes.

*Q.* You had a brief case in your hand containing money?

*A.* I had a brief case, also money from the register. I had both hands full.

*Q.* Was this near the front of the store?

*A.* No, at the rear.

*Q.* Were you going out to the parking lot?

*A.* Yes.

*Q.* And then when you came to, were you on the ground?

*A.* Yes, I was just bent over like this (indicating) and I raised up.

*Q.* And when you raised up you said you saw your attacker do what?

*A.* He was going through my money sacks. Momentarily, he didn't see me looking at him because he was so engrossed in finding money. He just kept looking.

*Q.* Were you able to see his face then?

*A.* Yes, I reached for the boxes immediately, that is when he pulled back, and he picked up this club and started on me, when I looked at him, as he was fumbling through the boxes.

*Q.* Did you say anything to him?

*A.* I don't think I did.

*Q.* You were dazed?

*A.* Yes, I was trying to regain my senses, then I automatically reached for my money—just a second nature I guess.

*Q.* When you first saw him going through the boxes, was there any thought that came to your mind then as to who he was?

*A.* No, all I knew was that I had to protect myself, to get back what I lost. I knew he had something in mind, and it was on my mind when he started that striking.

*Q.* Before you started struggling, did you know who he was?

*A.* For just a split second, when he was bent over with the hood on.

*Q.* Did he have a hood on his head?

*A.* Yes.

*Q.* So then he saw you then?

*A.* Yes, he looked up. I could see him right there.

*Q.* You were still on the ground?

*A.* I raised back off my knees, sitting up, looking at him.

*Q.* When was it as you now recall that you first identified him?

*A.* When he started striking me and this hood kept bobbing on his head. I could see the features of his face very good and then this premature baldness that he has.

*Q.* Did the hood go over the top of his head at this time?

*A.* As I recall, he kept reaching, making sure that it didn't fly off.

*Q.* Then he had a club of some kind?

*A.* Yes, right to his left, he had a club lying there.

*Q.* And so then when you saw him he was coming toward you with the club?

*A.* No, he was right there in front of me; couldn't be a matter of two feet. What he did was pick up that club and start whacking away at me.

*Q.* When you did see his face as you have described it, what was your thought then about who he was?

*A.* I didn't. The thought didn't enter my mind as to it right there as to identification. My thought then was to save my life; either overcome him or get out of there. I knew when he starting hitting me there he might split my head open. I was in bad shape.

*Q.* When did you first realize who he was; when you, if you did, realize this?

*A.* When he was striking me and the hood was bobbing back and forth.

*Q.* Now as to this identification, you say you saw his face as the hood was bobbing back and forth, as

I understand you to say, that is when you identified him?

*A.* Yes, that is when I recognized him.

*Q.* What was your thought about the identification at that time?

*A.* To grab him.

*Q.* I mean as to who he was.

*A.* I had no thought.

*Q.* Do you know who he was? That is what I am getting at, when you saw his face, as to his facial features?

*A.* Yes, when he ran down to the corner of the building. He was fairly bow-legged, bent down. I thought he was hurt at first. Now I realize that it is just a characteristic of his makeup.

*Q.* Now when you did, as you say, recognize who he was, did you then think who he was?

*A.* I had no thought in my mind. The only thought in my mind was to save my life. And I can't say I had any particular thought about the boy at the time.

*Q.* Was there any thought that came to your mind whether it was somebody you had seen before?

*A.* Yes, I knew who he was, but not the name. But everything was going so fast. It was just for a fraction.

*Q.* Did you then conclude that was the boy who had been in your store?

*A.* Yes.

*Q.* But you didn't know his name?

*A.* No, it didn't come to me immediately because I know so many people and especially with kids coming in, I don't know their names. I've probably seen them many times but you don't retain their names unless they mean something special to you.

*Q.* Was there any question in your mind as to the fact that you had seen him in the store before?

*A.* No.

*Re-cross Examination*

*By Mr. Everett:*

*Q.* You are positive he had been in the store before?

*A.* Sure, I've known him for years. I remember him coming in the store.

*Q.* Then you were clubbed again?

*A.* Yes.

*Q.* And after you were clubbed again you then saw him running down the length of the building?

*A.* Right. I followed him.

*Q.* Did you have another chance to see his face?

*A.* No, he had his back to me then.

*Q.* That is when you saw him running, as you say, kind of pigeon toed, or something like that?

*A.* Yes, I realize now, something like a wrestler.

*Q.* You look at him now. Is there any question in your mind; is there any question that he is the one that attacked you?

*A.* None whatsoever, unfortunately.

*Q.* If you had [not?] seen him at the hospital, would have been able to identify him?

*A.* Yes, I could.

*Q.* You say there was a light on the ground where the scuffling was taking place?

*A.* Yes, because he was sitting directly in the light from the meat department. My back was to it when he was sitting right in there.

*Q.* Was this a bright light or not?

*A.* Oh yes, some overhead lights—fluorescent—and the light was right on his face, right directly on his face.

*Q.* During the course of the struggle, were you knocked unconscious at any time since the first time?

*A.* No.

*Q.* You said the name came to your mind; when did it come to your mind?

*A.* Oh, as I recall it, riding in the ambulance and thinking about the whole thing and in the hospital, lying in bed.

*Q.* That was before your brother came in and told you that the police were going to bring somebody in. Is that correct?

*A.* Yes.

*Q.* And that was before the police officer came to you in the hospital and said: 'We are going to bring the man in twice, and we want you to look at him twice?'

*A.* Yes."

The victim stated at the *Wade* hearing that he had known the defendant and his family for several years and described them as having a "sucking lemon" look, but he did not tell the police at the time of the crime that the robber was someone that he knew, although he gave a description of the robber saying that he was a white male of medium build wearing a red-hooded jacket. His unexplained failure to mention that he had recognized the robber, until after he had seen the defendant in the hospital, creates a "credibility gap" for his later testimony that he knew the defendant was his assailant before their meeting in the hospital.

While there was evidence supporting the trial judge's determination that the in-court identification had a basis separate from the hospital confrontation, we are of the definite and firm conviction based on the victim's own testimony that it was a mistake to admit the identification because it was tainted by the prejudicial hospital meeting. "Moreover, '[i]t is a matter of common experience that, once a witness has picked out the accused at the line-up, he is not likely to go back on his word later on, so that in practice the issue of identity may (in the absence of other relevant evidence) for all practical purposes be determined there and then, before the trial.'" *United States* v. *Wade, supra,* quoting

Williams & Hammelmann, Identification Parades, Part I, [1963] Crim L Rev 479, 482.

We hold that the prosecution has failed to carry its burden of proof. *People* v. *Young, supra.* The record does not show by clear and convincing evidence that the in-court identification was not tainted by the prior illegal hospital identification. *People* v. *Hutton* (1970), 21 Mich App 312. We are not satisfied beyond a reasonable doubt that admission of that in-court identification was harmless, and so, the conviction must be reversed. *Chapman* v. *California* (1967), 386 US 18 (87 S Ct 824, 17 L Ed 2d 705, 24 ALR3d 1065),[5] *People* v. *Hutton, supra.*

The defendant's next issue concerns the denial of his motion for a mistrial based on a comment of the prosecution relative to an exhibit which was not admitted into evidence. Since we are reversing and remanding this case for a new trial because of the error in admitting the in-court identification, it is not necessary to discuss this issue because it is unlikely to occur at the retrial.

The defendant also argues that the trial court committed reversible error in failing to give certain jury instructions offered by defense counsel. The record shows that those portions of the requested jury instructions which were accurate statements of the law and relevant to this case were adequately covered by the trial judge. *People* v. *Fred W. Thomas* (1967), 7 Mich App 519, *leave to appeal denied* (1967) 379 Mich 789.

We find no merit in the defendant's attack on the prosecutor's opening statement. In view of our disposition of this case, the other two issues stated do not require discussion.

Reversed and remanded for a new trial.

All concurred.

---

[5] Reh den, 386 US 987.