PEOPLE v NIXON

Docket No. 52685. Submitted December 8, 1981, at Grand Rapids.—
    Decided March 17, 1982. Leave to appeal applied for.
    Richard M. Nixon was convicted of two counts of first-degree
    murder by a jury in Van Buren Circuit Court and was sen-
    tenced to two concurrent sentences of life imprisonment, Meyer
    Warshawsky, J. Defendant appeals. *Held:*

    1. Any error which may have occurred as a result of the trial
    court's allowing into evidence testimony enhanced by hypnosis
    was harmless beyond a reasonable doubt.

    2. Defendant's objection to the testimony of a state police
    laboratory scientist who conducted blood comparisons which
    placed defendant within a group comprising less than 1.6
    percent of the caucasian population and approximately 5.7
    percent of the black population on the ground that the method
    employed was not generally recognized as reliable by the
    scientific community was not raised at the trial level and is
    therefore waived on appeal.

    3. The trial court did not abuse its discretion by admitting
    the testimony of the state police laboratory scientist because
    defendant offered no evidence that the technique used to com-
    pare the blood samples was scientifically inaccurate or seriously
    disputed.

    4. Any error which may have occurred by the trial court's

REFERENCES FOR POINTS IN HEADNOTES
[1] 29 Am Jur 2d, Evidence § 831.
    81 Am Jur 2d, Witnesses § 438.
    Necessity and admissibility in federal trial, of expert or opinion
        testimony regarding use or reliability of hypnotically refreshed
        recollections. 50 ALR Fed 602.
[2] 29 Am Jur 2d, Evidence §§ 818, 823.
[3] 4 Am Jur 2d, Appeal and Error § 159.
    21 Am Jur 2d, Criminal Law § 390.
    77 Am Jur 2d, Venue §§ 48, 84.
[4, 6] 77 Am Jur 2d, Venue § 79.
[5, 6] 21 Am Jur 2d, Criminal Law § 389.
    77 Am Jur 2d, Venue § 60.
    Pretrial publicity in criminal cases as grounds for change of venue.
        33 ALR3d 17.

admission of the testimony of the state police laboratory scientist due to the fact that the testimony may have been more prejudicial than probative was harmless in light of the other evidence presented at trial.

5. The trial court did not commit error by refusing to grant defendant's motion for change of venue on the grounds of pretrial publicity. Defendant failed to demonstrate a pattern of strong community feeling or bitter prejudice against him.

Affirmed.

1. WITNESSES — HYPNOSIS.

A witness whose memory has been restored or created through hypnosis may not testify about those incidents recalled only under hypnosis but may testify about those aspects of a case remembered prior to undergoing the hypnosis.

2. EVIDENCE — SCIENTIFIC TECHNIQUES.

The rule which requires that a scientific technique must be accepted in the particular field in which it belongs and that such acceptance can be established only by testimony of disinterested and impartial experts in that field before evidence obtained through the technique is admissible does not apply where there is no evidence offered to show that the technique is scientifically inaccurate or seriously disputed.

3. VENUE — CRIMINAL LAW — CHANGE OF VENUE.

The denial of a motion for a change of venue is within the trial court's discretion and its decision will not be reversed unless there has been an abuse of discretion.

4. VENUE — CRIMINAL LAW — CHANGE OF VENUE.

A trial court may properly defer determination on a request for a change of venue in a criminal case until an attempt has been made to select a jury in the county where the crime occurred, and to follow this established rule is not an abuse of discretion.

5. VENUE — CRIMINAL LAW — PRETRIAL PUBLICITY — CHANGE OF VENUE.

The existence of pretrial publicity does not by itself require a change of venue; if jurors can lay aside their impressions or opinions and render a verdict based on the evidence presented in court, a change of venue is not necessary.

6. VENUE — CRIMINAL LAW — CHANGE OF VENUE.

A defendant, in order to be entitled to a change of venue, must demonstrate that there is a pattern of strong community feeling or bitter prejudice against him and that publicity is so

extensive and inflammatory that jurors could not remain impartial when exposed to it.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *Ward S. Hamlin, Jr.,* Prosecuting Attorney, and *Mary C. Smith,* Assistant Attorney General, for the people.

*P. E. Bennett,* Assistant State Appellate Defender, for defendant on appeal.

Before: T. M. Burns, P.J., and R. B. Burns and M. J. Kelly, JJ.

M. J. Kelly, J. Defendant, Richard M. Nixon, was found guilty of two counts of first-degree murder, MCL 750.316; MSA 28.548, and received two concurrent sentences of life imprisonment. Defendant appeals as of right, GCR 1963, 806.1.

Defendant was arrested for the shooting deaths of James and Sandra Frank. At defendant's trial, Diane Downer, defendant's girlfriend and accomplice, testified that she and defendant had planned to take $30,000 from James Frank when he came to their home to complete a prearranged deal to buy $30,000 worth of marijuana. When Frank arrived, Downer let him in and led him to the dining room. As Frank entered the room, defendant hit him over the head with a champagne bottle, but failed to render him unconscious. A struggle ensued which ended when defendant shot Frank in the shoulder.

Downer testified that to protect their reputations as "honest" drug dealers, she and defendant decided to kill Frank. While transporting Frank to a secluded spot, he escaped from the pick-up truck and ran to a nearby home. As Downer and defendant were struggling to get Frank back into the

truck, Donald VerHage came to the door of the house. As Nixon placed Frank in the truck, Downer informed VerHage that Frank had been in an accident and they were taking him to the hospital. After this incident, they drove Frank to a secluded spot behind his house where defendant shot him in the head. The pair then went to Frank's house where they convinced his wife to accompany them to the same spot where they had killed her husband. As she stepped off the truck, defendant shot her in the head.

During defendant's trial, the prosecution called VerHage to testify. Defendant objected to VerHage's testimony claiming it was the product of hypnotic suggestion. VerHage testified that he recognized Downer as the woman he saw on his lawn. He also testified that he only had a side view of the man involved in the incident but thought defendant looked like the man. The jury was informed that VerHage's testimony had been assisted by hypnosis, and, on defendant's motion, tapes of VerHage's prehypnotic and posthypnotic testimony were played.

Defendant presented an alibi defense and rested his case. The jury returned a verdict of guilty on each count.

I

On appeal, defendant argues that the admission of posthypnotic testimony is grounds for reversible error per se. Recently, this Court examined the use of hypnotically refreshed testimony in *People v Gonzales,* 108 Mich App 145; 310 NW2d 306 (1981), *lv gtd* 412 Mich 870 (1981). In *Gonzales,* the Court held that a witness whose memory had been restored through hypnosis could not testify about

those incidents only recalled under hypnosis. *Id.,* 160-161. In *People v Wallach,* 110 Mich App 37; 312 NW2d 387 (1981), a companion case of *Gonzales,* the same panel noted that a witness who had been hypnotized would not necessarily be precluded from testifying. The witness could testify about those aspects of the case remembered prior to undergoing the hypnosis. *Id.,* 72. Finally, in *Wallach, supra,* the Court refused to reverse that defendant's conviction even though the hypnotically refreshed testimony was introduced because any error which did occur was harmless. *Id.,* 75.

While we accept the principles announced in *Gonzales, supra,* and *Wallach, supra,* we do not feel that the allowance of the hypnotically refreshed testimony in this case warrants reversal. In his testimony at trial, VerHage stated that he had a clear view of Downer but could only see a side view of defendant. While he stated that defendant looked like the man, he was unable to state that defendant was the man he saw putting Frank in the truck. Furthermore, defense counsel was allowed to play tapes of VerHage's testimony before hypnosis and after hypnosis to the jury. This enabled the jury to judge the credibility of VerHage's posthypnotic testimony.[1] Finally, the most damaging evidence against defendant was given by Downer, whose testimony was not enhanced by hypnosis. Under the circumstances in this case, any error which did occur from the hypnotically refreshed testimony was harmless beyond a rea-

---

[1] While the playing of the prehypnotic testimony and posthypnotic testimony is relevant to show that the error of allowing VerHage to testify about his hypnotically refreshed testimony is not prejudicial, we do not hold that this procedure will justify the use of hypnotically enhanced testimony. In the future, trial courts should not allow such testimony.

sonable doubt. *People v Swan,* 56 Mich App 22, 31; 223 NW2d 346 (1974), *lv den* 395 Mich 810 (1975).

## II

Defendant also objected to the testimony of David Metzger, a state police laboratory scientist. Metzger compared certain blood samples taken from VerHage's front porch and from defendant's home. He found that both samples were B type blood containing haptoglobin. According to Metzger, the combination of Type B and haptoglobin type 1 occurs in less than 1.6 percent of the caucasian population and approximately 5.7 percent of the black population. Metzger opined that the blood samples could have had a common origin. Defense counsel objected stating, "my only problem is, your Honor, we are going to be talking about 20 million people that have it". His objection was overruled.

On appeal, defendant argues that the method employed by Metzger to compare the blood samples was not generally recognized as reliable by the scientific community. However, defendant failed to object to the evidence on this ground at trial and has waived review of this issue on appeal. MRE 103(a)(1), *People v Rojem,* 99 Mich App 452, 457-458; 297 NW2d 698 (1980). Furthermore, because defendant offered no evidence that the technique used to compare the blood samples was scientifically inaccurate and because defendant has not convinced us that the accuracy of the technique is seriously disputed, the trial court did not abuse its discretion in admitting Metzger's testimony. *People v Young,* 106 Mich App 323, 329; 308 NW2d 194 (1981).

Defendant also objected to the testimony on the grounds that it was more prejudicial than probative. Defendant cites *People v Sturdivant,* 91 Mich App 128, 134; 283 NW2d 669 (1979), where this writer found that blood test evidence indicating that the complainant's attacker was a nonsecretor, that the attacker thus possessed a trait found in 20 percent of the general population and that defendant was a nonsecretor was inadmissible. The holding in *Sturdivant* has since come under attack. *People v Horton,* 99 Mich App 40, 50-51; 297 NW2d 857 (1980), *vacated on other grounds,* 410 Mich 865 (1980). In a concurring opinion in *People v White,* 102 Mich App 156; 301 NW2d 837 (1980), this writer clarified his holding in *Sturdivant.* The reason behind the rule announced in *Sturdivant* is that blood sample evidence which places defendant in a large group is more prejudical than probative. If the blood test evidence places defendant in a small enough group, it might become more probative than prejudicial. In *White,* this writer suggested that establishing the proper proportional dimension should be left to the trial court's discretion. *Id.,* 165.

In this case, the blood test evidence placed defendant in a group consisting of 1.6 percent of the caucasian population and 5.7 percent of the black population. Because the group is small, the question of whether this was too large a group to make the evidence more prejudicial than probative was a decision which should be left to the trial court's discretion. Furthermore, even if the trial court erred in admitting the evidence, the error was harmless in light of the other evidence presented at trial. *Id.,* 165. We will not reverse defendant's conviction on this issue.

### III

Defendant's final claim of error concerns the trial court's refusal to grant defendant's motion for change of venue because of alleged pretrial publicity.

The denial of a motion for a change of venue is within the trial court's discretion, and its decision will not be reversed unless there has been an abuse of discretion. *People v Swift,* 172 Mich 473, 479-480; 138 NW 662 (1912), *People v Clay,* 95 Mich App 152, 160; 289 NW2d 888 (1980). An abuse of discretion has been defined in different ways. Whether it is tested by *Spalding v Spalding,* 355 Mich 382, 384-385; 94 NW2d 810 (1959),[2] or by the often alluded to stricter standard of *People v Charles O Williams,* 386 Mich 565, 573; 194 NW2d 337 (1972), in criminal cases, it is nevertheless clear that an abuse of discretion is not implicated where a trial court elects to defer determination on a request for change of venue until jury selection has been attempted in the original county. *Swift, supra,* 481-482, *People v Collins,* 43 Mich

[2] In *Spalding, supra,* 384, the Supreme Court gave the following definition:

"Where, as here, the exercise of discretion turns upon a factual determination made by the trier of the facts, an abuse of discretion involves far more than a difference in judicial opinion between the trial and appellate courts. The term discretion itself involves the idea of choice, of an exercise of the will, of a determination made between competing considerations. In order to have an 'abuse' in reaching such determination, the result must be so palpably and grossly violative of fact and logic that it evidences not the exercise of will but perversity of will, not the exercise of judgment but defiance thereof, not the exercise of reason but rather of passion or bias."

However, Justice LEVIN in a concurring opinion has criticized the use of this test claiming the *Spalding* "hyperbolic standard" leads judges and lawyers to believe that discretionary decisions are immune from review. *People v Talley,* 410 Mich 378, 396; 301 NW2d 809 (1981).

App 259, 262; 204 NW2d 290 (1972), *lv den* 391 Mich 798 (1974).

The existence of pretrial publicity does not by itself require a change of venue. *Murphy v Florida,* 421 US 794; 95 S Ct 2031; 44 L Ed 2d 589 (1975). If jurors can lay aside their impressions or opinions and render a verdict based on the evidence presented in court, a change of venue is not necessary. *Irvin v Dowd,* 366 US 717, 722-723; 81 S Ct 1639; 6 L Ed 2d 751 (1961), *Swift, supra,* 481-482, *People v Dixon,* 84 Mich App 675, 679; 270 NW2d 488 (1978). For a change of venue to be granted the defendant must . demonstrate that there is a pattern of strong community feeling or bitter prejudice against him, and the publicity must be so extensive and inflammatory that jurors could not remain impartial when exposed to it. *Clay, supra,* 160, *Collins, supra,* 263.

In this case, there was extensive pretrial publicity concerning defendant's case. Of the 65 veniremen, only 4 had not heard of the case. The trial judge had to excuse 18 potential jurors for cause. However, each of the jurors who were seated stated that they had no preconceived notions concerning defendant's guilt or innocence and could render an impartial verdict. While a large number of prospective jurors did have an expressed opinion, we do not feel that defendant has demonstrated a pattern of strong community feeling or bitter prejudice against him. Defendant's conviction is affirmed.

Affirmed.